SCRANTON, The E. C. See Cases Nos. 4,270–4,273.

## Case No. 12,559.

SCRIBA et al. v. DEANE et al.

KUNKALL et al. v. SAME.

[1 Brock. 166.] [1]

Circuit Court, D. Virginia. Nov. Term, 1810.

JUDGMENTS—PRIORITIES—DECREE—EXECUTION ISSUED—STAY OF EXECUTION.

1. A creditor obtained a judgment against his debtor, on the 15th of November, 1800, with a stay of execution, till the 1st of June, 1801. Another creditor obtained three judgments, on the 1st of December, 1800, and other creditors obtained a decree, on the 20th of March, 1801, against the same debtor. The second creditor, issued fi. fa.'s on two of his judgments, on the 13th of March, 1801, which were levied, and a fi. fa. was issued on the third and largest judgment on the 1st of April, 1801. The debtor executed a mortgage of his land, to secure the second creditor, on the 27th of April, 1801, which was recorded on the 25th of May following; and the officer returned the fi. fa.'s on the 30th of April, 1801, with different endorsements, that is, that he had levied two of them, and the property was released by order of the plaintiff, and on the third, that "proceedings were stopped by order of the plaintiff." The second creditor covenanted with the mortgagor, that he would not proceed further on the judgments, till the property conveyed by the mortgage was regularly disposed of, and to return the property taken, under the three executions in the officer's hands. On suits in chancery brought by the decree creditors, against the judgment creditors and their mutual debtor, for the purpose of ascertaining the order in which the several liens of these respective creditors were chargeable upon the real estate of the debtor, and for a distribution amongst them accordingly, (the land having been sold by order of court, and the proceeds brought into court by the commissioners), it was *held*, that the fund in the hands of the commissioner was properly chargeable, in the first instance, with all the costs incurred by the parties creditors, whether plaintiffs or defendants.

2. A decree in chancery, equally with a judgment at law, creates a lien on lands.

3. A judgment, with a stay of execution, creates no lien on land, until the plaintiff has a right to issue execution thereon.

[Cited in Bank of U. S. v. Winston, Case No. 944.]

[Cited in Enders v. Board of Public Works, 1 Grat. 378. Distinguished in Lisle v. Cheney, 36 Kan. 585, 13 Pac. 820. Cited in Reed v. Austin's Heirs, 9 Mo. 729.]

4. The return of the marshal on the two first executions, determined the force of the judgments on which they were issued, and destroyed the lien thereby created on the debtor's lands.

5. Equity will not connect the deed of mortgage with the judgments, so as to preserve the original lien.

6. The language of the return on the third execution, imports, that it had not been levied, and the implied averment of service in the covenant to suspend proceedings on the judgments, (the fact, whether it was levied or not being wholly immaterial in the view of the covenantor,) does not conclude the party.

7. The covenant to suspend, &c., not being perpetual, did not amount to a release, nor discharge the lien created by the third judgment on the land.

[Cited in Mendenhall v. Lenwell, 5 Blackf. 126.]

[1] [Reported by John W. Brockenbrough, Esq.]

8. The third fi. fa., having come to the hands of the officer, when he had property of the debtor in his possession, under former executions, was not levied, ipso facto, by mere operation of law: there must be an actual, and not a mere constructive levy.

9. The lien on land, created by judgment, depends upon the right of the plaintiff to sue out an elegit, and it is not essential to the existence of the lien, that the elegit shall have actually issued.

10. The lien of the largest judgment, in favour of the second creditor, not being lost by the covenant to suspend, and being preserved by the failure to levy the fi. fa., sued out upon it, judgment must first be satisfied, the decrees of the plaintiffs next, the decree creditors, and the other creditors, whether by judgment, decree, deed of trust, or mortgage, to rank according to their dates respectively.

These suits were brought by the plaintiffs on the chancery side of this court against James, Thomas, and Francis Deane, and others, their creditors, for the purpose of enforcing their liens on the estate of James and Thomas Deane, created by two several decrees of the court of chancery of the state, pronounced in their favour, respectively, on the 20th of March, 1801. The plaintiffs prayed that the other creditors of the Deanes, defendants, might be compelled to make a discovery of their several liens, and claimed a priority over them all. The material facts in these causes were as follows: On the 15th of November, 1800, a judgment was rendered in the county court of Henrico in favour of John Allan against the debtor defendants, with a stay of execution till the 1st of June, 1801. On the 1st of December, 1800, Henry S. Shore and Thomas Reeves, surviving partners of William Anderson & Co., obtained three several judgments on the law side of this court against the same defendants; and on the 5th of May, 1801, they obtained a fourth judgment: and on the 20th of March, 1801, the plaintiffs, Scriba, Scroppal & Sturman, and Kunkall & Co., each obtained a decree in the state court of chancery against two of the debtor defendants, James and Thomas Deane. There were various other creditors by judgments, mortgages, and trust deeds of a later date, claiming liens on the real estate of the Deanes, all of whom were made defendants in the present suits. Shore sued out writs of fi. fa. on his two smaller judgments on the 13th of March, 1801, and on the third judgment another writ of fi. fa. on the 1st of April, 1801. After these writs were in the hands of the officer, James and Thomas Deane, by deed bearing date the 27th of April, and recorded the 25th of May, 1801, mortgaged their real estate for the purpose of securing all the debts due by judgment to William Anderson & Co. To that deed Henry S. Shore, as agent for, and surviving partner of, William Anderson & Co. appended a memorandum by which he covenanted, "that no farther proceeding shall be had at law on any of the judgments which William Anderson & Co. have, or may have, against the said Deanes, until all the property con-

veyed by them in trust shall be regularly disposed of, and then only in case of a balance unsatisfied. And, moreover, to return all the property lately taken by the marshal on account of executions on three of the debts mentioned in this deed." On the 3d of April, 1801, the marshal returned all three of the writs of fi. fa., on the two of which that were first issued, he endorsed, "Executed on sundry property of the defendants, which hath been released by direction of Henry S. Shore, agent and co-partner of the above concern, he having compromised with the said defendants;" and on the third execution, issued on the 1st of April, 1801, was the following endorsement, "Proceedings on this execution stopped by direction of Henry S. Shore, agent and co-partner of the above concern, by reason of the compromise having taken place between the said Shore and the defendants." The lands of the three Deanes having been sold under a previous order of this court, and the proceeds of sale having been brought into court by the commissioner, the question now submitted to the court respected the order in which the various creditors were entitled to rank in charging this fund.

MARSHALL, Circuit Justice. These suits are brought for the purpose of distributing the estate of the defendants, James, Thomas, and Francis Deane, among their creditors; some of whom have liens on the estate by judgment, and others by mortgage or deeds of trust. As the parties, creditors, are necessarily brought before the court for the purpose of ascertaining their respective claims, it is deemed just that the fund should be charged, in the first instance, with all the costs incurred by them in this suit. Although some of these liens are upon the estate of all three of the Deanes, some on the estate of James and Thomas Deane, and others on the estate of James and Francis Deane, the court is not required to make, at least for the present, those particular discriminations which will ultimately be necessary. For the present, the fund has been considered as a joint fund liable to the claims of all the creditors, and the court is required only to settle their priority.

John Allan, William Anderson & Co., and the plaintiffs, Scriba, Scroppal & Sturman, and Kunkall & Co., each claim the preference. A preference is also claimed by the estate of Thomas Gilliat. John Allan obtained a judgment in the county court of Henrico, on the 15th of November, 1800, with a stay of execution till the 1st June, 1801. William Anderson & Co. obtained three judgments in this court, on the 1st of December, 1800. The plaintiffs, Kunkall & Co., and Scriba, Scroppal & Sturman, each obtained a decree in the high court of chancery, on the 20th of March, 1801. On the former argument it was decided, that in Virginia, a decree in chancery is equally a lien on lands

with a judgment at law. The judgments and decrees, therefore, class together. The judgment in favour of John Allan having been first rendered, would constitute the first lien, had there been no stay of execution. The rank of that judgment depends on the question, whether the lien takes place at its rendition or at the time when execution may issue on it. It must be admitted, that a judgment at common law did not bind lands, and that there has been no statute which, in direct terms, creates the lien. But courts have so construed the statute which gives the elegit as to infer a lien from the power to take the lands in execution. The lien, then, grows out of the right to issue the elegit, and is, consequently, inseparably connected with that right. It would seem to follow, irresistibly, from these premises, that Allan's judgment constituted no lien on the lands until it was in his power to issue execution thereon. This was on the 1st of June, 1801.

The judgments of William Anderson & Co. come next to be considered. Three of these were rendered on the 1st of December, 1800, and the fourth, on the 5th of May, 1801. On all these judgments executions were issued; but as the returns on these executions were different, they must be separately considered. On two executions, the return of the officer is, that they were executed and the property released by order of the plaintiff, in consequence of a compromise between the parties. That this return determined the legal force of these judgments, is admitted. Of course they no longer constitute a lien at law on the lands of the debtor. But it is contended, that deeds executed on the lands bound by these judgments being executed for the same debt while the judgments were in force, and being the consideration for which the judgments were released, may be connected with these judgments in equity so as to continue the original lien.

The real object of this suit is to adjust legal priorities, and this court, if not directed by express authorities, would not be inclined to interfere with those priorities, in any other case than in one in which a preference had been improperly obtained, and in which that impropriety had been made the particular subject of inquiry. At law, it is clear, that no lien can commence at a time anterior to its own existence. The common case of mortgages not recorded and renewed, appears to be directly in point. It has never been conjectured, that a subsequent mortgage, for the same property, could be connected with a prior mortgage not recorded, or recorded and reconveyed, in such manner as to defeat creditors or purchasers without notice, claiming under a deed made previous to the existing conveyance. The cases of Eppes v. Randolph, 2 Call, 125, and Tinsley v. Anderson, 3 Call, 329, are, however, cited as authorities to prove, that this may be done in equity. Neither of those cases connect a prior with a subsequent lien. They keep alive, in equity, a lien which was extinguished, at law, in favour of a person who is invested with all the equity of the original holder of the judgment. Those cases, in my opinion, go a great way. I shall respect them in a case precisely similar, but shall not extend their application. The judges have not stated the grounds of those decisions, but they were pronounced in favor of sureties who had discharged judgments against their principals and themselves, and I shall not consider them as extending to cases of a different description. Under these two judgments, then, William Anderson & Co. can claim nothing.

On the executions issued on the remaining two judgments, the return on each is, that proceedings on the execution were stopped by order of the plaintiffs in consequence of a compromise between the plaintiffs and the defendant. It has been contended, that the words of this return are equivalent to an express declaration, that the execution was levied, because proceedings, it is said, could not be stopped, unless they had commenced. This criticism appears to the court to be overstrained. The person who is stopped from proceeding, might very naturally say, "the proceedings are stopped." Where the attention is not particularly directed to the construction which may be put upon words not cautiously guarded, human language is susceptible of different constructions. But these expressions ought always to be received in the sense in which all the circumstances attending them prove that they were used. The execution of process is a positive fact, which it is the duty and the practice of the officer to return expressly, and never to leave to implication. The circumstance of his not having returned it, is full evidence that he did not consider the execution as levied. This is, in this case, the more apparent from the returns made on the other executions in the same case, by the same officer. Of three executions in his hands at the same time, he has returned on two, that they were executed, and that property was released; on the third, that proceedings were stopped. Why has he not returned, that the third was executed, as well as the second, if in fact it was executed? The fourth, unquestionably, was not executed. It was placed in the hands of the officer, after the compromise, and after the property was released. The return on the fourth execution is substantially in the words of the return on the third. Why, if the expression, "proceedings are stopped," means on the third execution that it was levied, is it used on the fourth, which most certainly was not levied?

Upon the return alone, I should feel no difficulty in deciding, that the execution did not appear to be levied, but the deed of compromise is introduced for the purpose of showing, that the execution was levied in fact. The fact, whether all three executions, or only two of them were levied, was so to-

tally unimportant to the parties in the view taken at that time, of the affair, as to render it improbable, that any inquiry was made respecting it. Mr. Shore knew that he had placed three executions in the hands of the officer. Mr. Deane knew that his property was executed at the suit of Mr. Shore. A compromise is entered into, by which the property is discharged from execution. Mr. Shore trusts to a new lien given him on lands, and agrees to suspend proceedings on the judgments. In the view of the parties, it is perfectly immaterial, whether the executions be all levied or not, and, consequently, the phrase used in the deed, does not include the party. The real fact may be proved, and, in my opinion, the return of the marshal is much more satisfactory evidence of a fact within his own particular knowledge, than the loose unguarded expression of the party, respecting a fact not within his knowledge, and which he then deemed entirely unimportant.

As this covenant not to resort to the judgment is not perpetual, it does not amount to a release, and, consequently, does not discharge the lien created by the judgment. But it is alleged that the execution, having come to the hands of the officer, while property belonging to the debtor was in his possession, under a former execution, was levied without any act of the officer by the mere operation of law. The inconveniences of this principle are so obvious, that it would be useless to enumerate them. It would require a positive statute, or express decisions, to induce this court to adopt it. Neither are adduced. The case of a detainer under a capias, is not in point. The sole object of that process is, the body, and when the body is in custody, the full effect of the execution is obtained. Nothing further is to be done by the officer. On a fieri facias it is otherwise.

It is next contended, that the lien created by a judgment does not take place, until a writ of elegit shall have actually issued on that judgment. This principle, in such direct opposition to the doctrine of the books, and so to the reason of the principle on which the lien depends, is supported by an expression used in the opinion of the court of appeals, in the case of Eppes v. Randolph. This particular point was not stirred at the bar, and was not considered as belonging to the cause. To consider the judge (Pendleton), in such a case, as laying down a new and important principle, contrary to uniform decisions, on vague and general expressions, would be doing injustice both to the judge and to the subject. It would require expressions, which could not be deemed careless, but which were obviously considered, and intended to have the effect now given them. But the case itself shows, that the judge did not mean to lay down the rule which is ascribed to him. He says, that previous to the act of 1772, the judgment of a county court could not bind lands lying out of the county, because an elegit could not run into another county. But when this law was changed, the lien was extended. His position would have been differently stated, if he intended to lay down the principle contended for. The judgment could not have bound the lands. It would have been the elegit itself. The expression, too, on the very point, shows his opinion. "We are then to inquire," says the judge, "what he ought to do, in order to preserve the lien." These words plainly imply, that there was a lien to be preserved. Having discussed Hansberry's judgment, he says, "the other judgments are liable to the same objections, of not having kept their liens alive," by the means before stated. He certainly did not mean to say, they had no lien to keep alive. If the opinion was, that it was not the judgment, but the actual issuing of the elegit which commenced the lien, that opinion would at once have terminated the cause, for the conveyances were prior to any elegit. The principle laid down afterwards, by the same court, in the case of Tinsley v. Anderson, proves, that the construction here given to the case of Epps v. Randolph is correct. In that case, the court admitted the lien created by judgments on which executions, other than an elegit, had issued.

NOTE. The following extract from the interlocutory decree rendered in these causes, presents, in a condensed form, the various interesting points decided by the chief justice, in the above opinion:

"The court being of opinion, that as the judgments, decrees, and deeds of trust and mortgages, are not chargeable upon the whole fund, some of them being against all, others against two of the defendants, Deanes only, and the deed of trust to John Henry, from Thomas Deane only, that the several creditors are entitled to rank upon such proportions of the fund, as belonged to the persons against whom the judgments or decrees were pronounced, when the lien is claimed thereby, and against such of the defendants Deanes, where it is claimed under deeds of trust, or mortgage, as executed such deed: And being also, of opinion, that the several plaintiffs and defendants, except the defendants Deanes, ought to be reimbursed all costs expended by them respectively, in these suits, out of monies now in the hands of the said commissioner, who is directed to pay the same, doth adjudge, order, and decree, that Charles Copland, Esq., who, with his consent, is appointed a commissioner for that purpose, do report the amounts to which the parties respectively are entitled out of the fund, according to the foregoing opinion, giving Henry S. Shore, and Thomas Reeves, surviving partners of William Anderson & Co, priority on their largest judgment obtained in this court, against the three defendants Deanes, on the 1st day of December, 1800: and the plaintiffs in these suits, to stand next in priority, Allan's judgment being postponed, to the incumbrances by deed, prior to the 1st of June, 1801, and the creditors secured by the deeds to take priority according to their respective dates, &c."